UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:  JASON CRAIG WALTENBERG and     :

        TAMMY LYNN EVERITT           :      Case No. 05-25084EF

            Debtor                :      Chapter 13


**MEMORANDUM OPINION SUPPORTING AND SUPPLEMENTING MAY 21,
2007 ORDER, WHICH (1) GRANTED, BUT REDUCED, COUNSEL'S SECOND
APPLICATION FOR ATTORNEYS' FEES AND (2) SANCTIONED COUNSEL
BY FURTHER REDUCING THE COMPENSATION APPROVED**


**I.  BACKGROUND**


On May 21, 2007, I issued and entered my written Order (the "May 21,

2007 Order"), granting, but reducing, a request for attorneys' fees for Debtors' counsel,

Eric L. Leinbach, Esquire ("Mr. Leinbach").  The May 21, 2007 Order reduced the

compensation requested by Debtors' counsel because he overcharged his fee for attending

a hearing.  I reduced the compensation sought by the amount of the overcharge for

attending the hearing.  I also reduced counsel's requested compensation as a sanction

because his overcharge was not the first of this nature that I have seen from Mr.

Leinbach.[1]  Mr. Leinbach filed an appeal from the May 21, 2007 Order on Thursday, May

---

[1]Throughout this Opinion, I will refer to the prior overcharges by Mr. Leinbach and my
reductions in his past fee requests.

31, 2007, and I am filing this Opinion supporting and supplementing my May 21, 2007

Order pursuant to Local Rule 8001-1(b) of the Eastern District of Pennsylvania

Bankruptcy Court.[2]  The discussion below represents my findings of fact and my

conclusions of law.[3]

I find, as I will explain more fully below, that Mr. Leinbach has continued

his practice of overcharging the estates of his clients in numerous ways.  His past

overcharges have been the subject of numerous recent decisions identified below.  In

those prior decisions reducing Mr. Leinbach's fees, I have imposed only modest sanctions

against Mr. Leinbach in hopes that he would acknowledge and fulfill his duty to assure

that his fee applications are entirely accurate and proper, which he has not done.

---

[2]Local Rule 8001-1(b) provides: "(b) *Opinion in Support of Order*.  The bankruptcy judge
whose order is the subject of an appeal may, within 15 days of the filing of the notice of appeal,
file a written opinion in support of the order or a written supplemental opinion that amplifies any
earlier written opinion or recorded oral bench ruling or opinion."
The SOURCE note for Local Rule 8001-1 explains: "This rule is derived from L.A.R. 3.1
of the Third Circuit's Local Rules.  Under subdivision (b) of this rule, a bankruptcy judge has the
same opportunity as a district judge to file an opinion after an appeal has been taken."

[3]I have been informed by counsel for the Chapter 13 Trustee and counsel for the United
States Trustee that Mr. Leinbach has stated his intention to withdraw his appeal in this case.
Pursuant to Local Rule 8001-1(b), however, I have only 15 days within which to file this
supplemental Opinion, so my deadline for filing it is today, June 15, 2007.  Despite Mr.
Leinbach's possible intention to withdraw the appeal of my May 21, 2007 Order, I file this
supplemental Opinion in support thereof, because this appeal remains of record.

## II.  PROCEDURAL BACKGROUND

Debtors, through their counsel, Mr. Leinbach, filed this Chapter 13

bankruptcy case on September 1, 2005.  Eight weeks after the initial filing, Mr. Leinbach

filed his original Rule 2016 Disclosure of Compensation by Attorney (the "Original

Disclosure"), disclosing that he had charged Debtor $1,800 as his fee in this case and that

he had received a retainer/deposit of $1,106.[4]  In January 2007, Mr. Leinbach revised his

Disclosure of Compensation, more than doubling his request for compensation to $4,300.[5]

The disclosures of compensation and fee applications that Mr. Leinbach

filed in this rather straightforward case contain a number of errors and misstatements.

Mr. Leinbach filed his original Application for Compensation and Reimbursement of

Expenses on November 10, 2005 (the "First Application").  The First Application

included a paragraph that described, in block billing form, the tasks that Mr. Leinbach

had performed.   The First Application sought approval of a fee of $1,800 and included a

request for reimbursement of the filing fee of $194 for a total of $1,994.  The Original

---

[4]As I will examine in detail below, the Original Disclosure and the First Application are
inconsistent. The First Application is misleading and sought reimbursement of an expense that
had already been paid by Debtor.

[5]Many attorneys, including Mr. Leinbach, do not feel obliged to live within their initially
disclosed compensation. The Disclosure of Compensation form includes a line permitting
counsel to note that certain additional fees might be required under certain circumstances.
Unfortunately, however, some lawyers do not use that provision to inform their clients that the
fee may be higher than originally represented. Their practice is to simply increase their fee when
and as they choose and file an amended Disclosure, as Mr. Leinbach did in this case and others.

Disclosure did not disclose that the filing fee remained unpaid and the retainer was in the odd amount of $1,106. I determined, therefore, even though the First Application stated to the contrary, that the filing fee had already been reimbursed to Mr. Leinbach by Debtors at the outset of this case. After Mr. Leinbach certified the First Application as being unopposed and after the Chapter 13 Plan in this case was confirmed, I considered the First Application and granted it on September 15, 2006. When I approved the First Application, however, I reduced the amount to be paid by $1,300, which represented the stated retainer of $1,106 plus the $194 filing fee, which had already been reimbursed. The net unpaid fee for the First Application, after applying the retainer and previously reimbursed filing fee, was $694.

Mr. Leinbach filed his Second Application for Compensation and Reimbursement of Expenses on January 23, 2007 (the "Second Application").[6] I approved the Second Application, with some reductions, through my May 21, 2007 Order. In the Second Application Mr. Leinbach originally requested a fee of $2,245 (in addition to the $1,800 fee from the First Application, which had already been approved), plus reimbursement of $42.78 in expenses. He misstated in the Second Application, however, that he had previously sought approval of, and had been paid a fee of, $1,500[7] plus $194 for expenses.

---

[6]The Second Application was referred to in the May 21, 2007 Order as the "Application."

[7]As discussed above, the First Application, as approved, sought fees in the amount of $1,800 and expenses in the amount of $194.

4

The Certification of Services Rendered attached to the Second Application identified individual time entries expended in work for Debtor, including a time entry for attending a hearing that struck me as possibly excessive. I determined, as I will discuss in more detail below, that the time charged for attending that hearing was excessive and I reduced the requested fee in my May 21, 2007 Order on that basis. The Second Application was also in error in that Mr. Leinbach had charged his 2007 attorney billing rate to 2006 attorneys' time.[8] A further, serious error seeking payment for certain tasks that had been or should have been included in the First Application and the fee awarded therein escaped my initial review.[9]

On March 22, 2007, I issued an Order To Show Cause Why Second Application for Compensation Should Not Be Reduced with a Sanction Imposed (the "Show Cause Order"). The Show Cause Order scheduled a hearing on the Second Application in March, but the hearing was continued to April 26, 2007, at the request of Mr. Leinbach. In response to the Show Cause Order, on April 25, 2007, Mr. Leinbach filed his Praecipe on Counsel's Second Application for Compensation for Amended Order and Substituted Certification of Services Rendered - Hourly Rate Reduced (the "Praecipe"), through which he withdrew the Certification of Services Rendered from the Second Application and substituted a revised Certification of Services Rendered (the

---

[8]As noted below, Mr. Leinbach corrected this error after I scheduled the Second Application for a hearing.

[9]See Section IV. C., below, for a discussion of the duplicate billing.

"Revised Certification"). The Second Application, with the Revised Certification, was the subject of the April 26, 2007 hearing.[10]  As he has done in the past,[11] Mr. Leinbach came to the hearing without records to support his compensation request. Once again, I granted him leave to supplement the record through a subsequent filing, which he did on May 3, 2007.[12]

After the April 26, 2007 hearing, I reviewed the docket in this case and other court records to determine certain information that I detail below. My research convinced me that Mr. Leinbach overcharged the estate for the time in which an associate attorney attended a hearing and I reduced his fee and imposed sanctions through my May 21, 2007 Order. In this Opinion, I will provide background information regarding my review of fee applications generally and of Mr. Leinbach's applications specifically. I will then examine the Second Application in this case and its overcharges in particular. Because no opposition to the Second Application has been filed, I will review the standard by which I have, sua sponte, considered and reduced his requested

---

[10]I have previously commented in Court about Mr. Leinbach's propensity for revising plans, motions, and other documents by praecipe immediately prior to a hearing, thereby depriving interested parties of the opportunity to oppose or comment on the change. In each case in which I allowed the revision by such a praecipe, the change inured to the detriment of the movant and to the benefit of all other parties. Similarly, the change in the Second Application occasioned by the Praecipe and Revised Certification reduced the fee sought by Mr. Leinbach, so I considered the revised Second Application without requiring further notice to other parties.

[11]See, e.g., In re Wise, No. 02-20931, slip op. at 17 (Bankr. E.D. Pa. April 3, 2007); and In re Bechtold, No.06-20586, slip op. at 2 (Bankr. E.D. Pa. May 15, 2007)(the hearing in Bechtold was on the same date as the hearing in this case).

[12]See document No. 87 on the docket in this case.

compensation. Finally, I will discuss the standard by which I have imposed the sanction that further reduces the amount of his compensation.

### III. REVIEWS OF FEE APPLICATIONS GENERALLY AND OF MR. LEINBACH'S IN PARTICULAR

A. Review of Fee Applications Generally

I was appointed to sit in the Reading Division of the Eastern District of Pennsylvania in February 2006. Although I had been involved to some extent with consumer debtors' counsel fees, I did not have substantial experience. Over my first six months or so as a judge, I reviewed dozens, certainly more than a hundred, consumer debtors' fee applications. In the course of that review I became familiar with the "going rate" charged by consumer debtors' attorneys and the amount and range of fees that might be charged in Chapter 13 attorney compensation cases.[13]  As part of my ongoing responsibility to review fees, even if uncontested,[14] I would review counsels' lists of their

----

[13]Since 2004, when the United States Supreme Court dispensed with the award of attorneys' fees from Chapter 7 debtors' estates to their counsel in Lamie v. United States Trustee, 540 U.S. 526, 1245 S. Ct. 1023 (2004), this Court does not review or approve Chapter 7 debtors' attorneys' fee applications for payment by the estate.

[14]See In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 840-45 (3d Cir. 1994).  See also the discussion of Busy Beaver below, for the duty of Bankruptcy Courts to review attorneys' compensation applications sua sponte, even if no other party to a proceeding objects or contests the application.

time entries for various tasks they had performed for their debtor-clients. Within the first

few months of sitting as a Bankruptcy Judge, I set hearings on otherwise uncontested fee

applications for most of the attorneys who regularly practice bankruptcy before me. I saw

that a large proportion of the fee applications were under the "no look" threshold of

$2,000.[15]   A very large percentage of fee applications were under $3,500.[16] But some of

the fee requests exceeded $3,500. Initially, I set hearings sua sponte for fee applications

that appeared unusual or that were in excess of $3,500,[17] and I asked counsel to explain

what they had done for the relatively higher fees in their applications. When Mr.

Leinbach testified in the Summer of 2006 about his fee applications for which I had set a

hearing, I was surprised to learn that he had no contemporaneous time-keeping system,

---

[15]Local Bankruptcy Rule 2016-2(a) permits counsel to dispense with specific, individual time entries and to file for a lump-sum fee if the total compensation for counsel in the case will be $2,000 or less. This is referred to colloquially as a "no look" fee.

I have observed more recently, however, that the lengthier preparation for and presentation of issues arising in Chapter 13 cases under the Bankruptcy Code as amended and revised by BAPCPA, effective October 2005, have led to many more fee applications in excess of the "no look" threshold of $2,000.

I will examine the "no look" fee in this case -- the First Application as permitted by Local Rule 2016-2(a) -- in more detail below. Mr. Leinbach has effectively presented duplicate billing for tasks that were included in his First Application that he also included in the Second Application. See footnote 9, above.

[16]As with the increase of cases requesting more than the "no look" $2,000 threshold for fees, the amounts of compensation in all fee applications has increased since the implementation of BAPCPA so that an application seeking fees in excess of $3,500 is now common.

[17]I tried to avoid loss of productive time for counsel by scheduling these hearings on dates on which counsel would be in court for some other matter. I continue to do this. For example, in this case, on March 28, 2007, I approved the continuance of the hearing scheduled for March 29, 2007 on Mr. Leinbach's Second Application because he had nothing else on my calendar that day.

either manual with a time-sheet and a pencil or through a computer with special software.

I will more fully discuss Mr. Leinbach's "after-the-fact" creation of time records below.

In the course of my examination of numerous fee applications, I noticed that some fees stood out as aberrations, being higher on average than others for similarly complex cases. When I refer to noticing aberrations on average, I do not mean to imply any precise, methodical, or organized review or calculation. I mean simply that as I reviewed the many fee applications, a framework of sorts developed in my mind and I saw that some counsels' fees were consistently higher than most others (I also saw that some requests for fees were consistently lower). I also noticed several time entries of several hours for specific tasks performed, particularly for attending hearings and for attending Section 341 first meetings of creditors.[18] I also noticed that Mr. Leinbach was and is the only attorney seeking approval of fees that were charged in 1/8-hour increments of time. Most other law firms charge time in 1/10-hour increments. I have not heretofore regarded this as an issue because some attorneys who bill in 1/10-hour increments rarely list an event whose time is 0.1 hours. I have not yet determined that billing in minimal increments of 1/8-hour is per se unreasonable.

My previous tacit approval of Mr. Leinbach's 1/8-hour billing came into substantial question, however, because I was surprised once again to discover both in this

---

[18]Section 341 of the Bankruptcy Code requires that the Trustee, in each case, schedule and conduct a meeting of creditors within a reasonable time after the bankruptcy case is initiated. 11 U.S.C. §341(a).

case[19] and in another of Mr. Leinbach's cases[20] that at least one of his associate attorneys

– Glenn T. Roth, Esquire ("Mr. Roth") – and perhaps others on his staff, recorded their

time in 1/10-hour increments.  Although Mr. Roth recorded his time for Mr. Leinbach in

1/10-hour increments, Mr. Leinbach billed his clients in 1/8-hour increments for Mr.

Roth's time.  I have not yet investigated this disparity, but I do not believe that it would

have had a material impact on my conclusions relating to the Second Application before

me in this case.  I point it out as another anomaly in Mr. Leinbach's efforts to receive

compensation.


B.  Review of Mr. Leinbach's Fee Applications


In my first half-year review, a disproportionate number of the fee

applications that appeared to be higher than the norm, taking into account the complexity

and number of tasks performed, were Mr. Leinbach's.  Many of the fee applications in

which abnormally high numbers of hours were charged for hearings or creditors'

meetings were also Mr. Leinbach's.  I do not state these general references as substantive

support for any of the discussion below about what Mr. Leinbach did and did not do in his

Second Application in this matter.  I provide this reference solely to establish how and

---

[19]Exhibit "A," attached as an exhibit to Mr. Leinbach's Supplemental Statement, document No. 87 on the docket in this case.

[20]In re Bechtold, No. 06-20586, slip op. at 6 and fn. 25 (Bankr. ED. Pa. May 15, 2007).

why I started to scrutinize Mr. Leinbach's fee applications more particularly in Fall 2006.

I also note at this point that Mr. Leinbach is a highly effective and tenacious advocate for his clients' interests in Bankruptcy Court. He is a bright and aggressive attorney who knows many procedural and substantive methods to establish, protect, and enhance his clients' rights and remedies. Despite his tenacity and ability, I have had no attorney who has been the subject of as many complaints by his existing and former clients relating to his refusal to represent them, generally when they could not pay him some additional retainer or agree to some increase in his fee. Unfortunately, difficulties between clients and counsel occur, but Mr. Leinbach is the only attorney practicing before me who has had more than one such complaint voiced against him. A number of his clients have complained on numerous occasions.[21] These complaints from Mr. Leinbach's clients are not presented to support the result in this case; rather, they are offered to support my belief that Mr. Leinbach's approach to his fees and compensation, which I had seen in the Summer and Fall of 2006, warranted my closer attention and scrutiny.

---

[21] See, e.g., In re Papp, No. 06-20973, order (Bankr. E.D. Pa. Oct. 26, 2006) (Mr. Leinbach's entire initial retainer was disgorged, granting the motion pressed by the United States Trustee). If Mr. Leinbach develops difficulties with his clients, or if fee disputes arise that cause him, in his professional judgment, to withdraw as counsel, he may do so and he has done so. See also In re Muzzicato, No. 03-24512 (Bankr. E.D. Pa.) (Mr. Leinbach was required to continue his representation of his client despite differences of opinion about aspects of the case). But as long as Mr. Leinbach remains counsel to his clients and has not withdrawn as counsel, his professional duty is to represent his clients and their interests in all court proceedings that arise. Unfortunately, I have had more than one of Mr. Leinbach's clients appear in Court without him, telling me that Mr. Leinbach wanted an additional fee, but the client could not afford it.

11

C. Initial Review and Reduction of Overcharges in Mr. Leinbach's Fee Applications

When I started to review Mr. Leinbach's applications more closely in the Fall of 2006, I noted what appeared to be instances in which Mr. Leinbach was charging one debtor/client the full amount of time for traveling to and attending a hearing or creditors' meeting, when he (or some other attorney in his firm) had actually represented two or three or more other clients at hearings or meetings on the same date in the same courtroom or meeting room. Despite his representation of multiple clients at these hearings and meetings, Mr. Leinbach did not pro-rate the time among the clients in his fee applications.[22] In other words, it appeared that Mr. Leinbach was double billing, triple billing, and more for attending hearings and creditors' meetings for multiple clients. This is precisely the type of over-billing that occurred in this case, and I will analyze this method of overcharging in more detail below.

Not wishing to embarrass Mr. Leinbach by addressing this discovery in public, in November 2006, I had an off-the-record sidebar conference with him and with counsel for the Chapter 13 Trustee, during a break in hearings on other cases. I told Mr. Leinbach that I had seen this overcharging in some of his bills and I would simply deduct

---

[22]To investigate his over-charging, I would (a) note that Mr. Leinbach (or another attorney in his office) had charged a certain amount of time for a hearing or meeting, (b) look at records of other hearings or meetings that day, (c) review other relevant court records, and (d) note the number of clients that Mr. Leinbach (or another attorney from his office) had represented that day.

some of his requested fees in orders otherwise approving his fees.  Mr. Leinbach was

apologetic and promised to examine his other fee applications more carefully to ensure

that this would not happen again.[23]


## D.  Review and Reductions of Mr. Leinbach's Fee Applications Later in 2006


On November 16, 2006, I held hearings in two other cases solely to review

Mr. Leinbach's fee applications.[24]  Because it appeared to me generally that the fees

charged were excessive for the work undertaken and the results achieved, I reduced both

of the fee requests.[25]  As with my previous, generalized review of Mr. Leinbach's fee

applications that I undertook in my first six months on the bench, I do not relate these

cases to establish that Mr. Leinbach has overcharged in the case at bar.  I refer to them for

two reasons:  First, to show my steps in dealing progressively with his overcharging; and

second, to support the imposition of sanctions against Mr. Leinbach, discussed in more

detail below.

---

[23]Following this side-bar, I reduced the fees in In re Kaminski, No. 01-25537, order
(Bankr. E.D. Pa. Nov. 14, 2006), and In re Ross, No. 03-23788, order (Bankr. E.D. Pa. Nov. 27,
2006), among other cases.

[24]In re Williams, No. 04-20617, and In re Sherer, No. 03-21188.

[25]Williams, order (Bankr. E.D. Pa. Dec. 18, 2006); Sherer, order (Bankr. E.D. Pa. Jan. 10,
2007).

E.  Review and Reduction of Mr. Leinbach's Fee Applications in Early 2007

1.  In re Faust, No. 06-20794, order (Bankr. E.D. Pa. Feb. 1, 2007), and In re
Wasilewski, No. 05-29021, order (Bankr. E.D. Pa. Feb. 1, 2007)

In early 2007, I noticed two cases that were similar and in which Mr.

Leinbach was counsel for the debtors.  Both cases had been dismissed.  Mr. Leinbach

nonetheless pursued his fee requests, both of which had been filed prior to dismissal.  The

cases were similar in the negative results obtained for his clients, but one case, In re

Faust, No. 06-20794, had taken only six months with very few adversarial or contested

disputes occurring through that time.  The other case, however, In re Wasilewski, No. 05-

29021, had taken over a year to administer, and included many disputes with creditors and

other parties in interest along the way.  The shorter, less conflict-laden Faust case had

roughly the same time charged, yet it had a somewhat higher request for compensation.

Having noticed this oddity, I examined both cases and held a hearing on February 1,

2007, for a review of Mr. Leinbach's fee applications in both cases.  Through the course

of the hearing, I learned that Mr. Leinbach (or another attorney in his office) had again

failed to pro-rate the time attributed to creditors' meetings among all of his clients for

whom he had performed the work.  In the Faust case, Mr. Leinbach's office charged to

the debtors all of the time (5.0 hours) for traveling to and attending a number of creditors'

meetings in which an attorney from his office represented several of their clients that day.

The time and fee were not prorated among all of his clients represented at these

meetings.  I approved his requested fee in <u>Faust</u>, but I reduced it from $3,875 to $3,200.[26]

The same basic overcharge occurred in the <u>Wasilewski</u> case.  Again, I approved his

requested fee, but I reduced it from $3,520 to $3,020.[27]

Mr. Leinbach also testified in the hearings on February 1, 2007, that he had

acquired and had started to use a computerized time-keeping system in the Fall of 2006.

In the <u>Faust</u> and <u>Wasilewski</u> cases, however, the time records had been compiled by going

back through the files to try to resurrect some idea of what had been done on behalf of the

client and how long it had taken.  Non-contemporaneous, after-the-fact re-creation of

time entries is clearly a deficient and inappropriate method of time-keeping.  The much

more appropriate contemporaneous time keeping that Mr. Leinbach now uses will,

hopefully, eliminate problems with his fee applications.[28]

In the February 1, 2007 hearing, Mr. Leinbach and a paralegal from his

---

[26]<u>In re Faust</u>, No. 06-20794, order (Bankr. E.D. Pa. Feb. 1, 2007) (although I had a sense that the overall fee, even as reduced, remained too high for the work performed, I could not point specifically to anything else and I therefore mistakenly did not reduce his fee below $3,200).

[27]<u>In re Wasilewski</u>, No. 05-29021, order (Bankr. E.D. Pa. Feb. 1, 2007) (unlike in <u>Faust</u>, my sense was that Mr. Leinbach's fees, after the reduction, were supported by the work undertaken in this case).

[28]I note with some regret and consternation that one of the issues in a fee application that was recently before me arose from the amount of time charged for Mr. Leinbach's attendance at a February 2007 hearing.  Issues of this nature should have been resolved by his contemporaneous time-keeping system.  <u>See In re Worsham</u>, No. 05-23848 (Bankr. E.D. Pa.)(Mr. Leinbach withdrew the <u>Worsham</u> fee application a day or so before I was prepared to issue my opinion on this issue, <u>inter alia</u>).  The excessive charge appeared to have resulted, not from inadequate records, but from Mr. Leinbach's proclivity to overcharge.

15

office testified that his staff would go through a file when he decided to bill it (generally

long after the work was actually performed), would look for any notations of time on

documents that were in the file, would estimate the time if no notation existed, and would

transpose the time entries into some word processing document (which was not produced

as evidence for me to consider).  Apparently, his staff would also look for hearings and

meetings within a case's electronic, on-line docket and guesstimate the amount of time

spent in attending any such hearing or meeting.  Mr. Leinbach's staff appeared to charge

an identical, fixed amount of time for particular tasks regardless how much (or little) time

was actually incurred to accomplish the task.  But that was the only way his office could

create time records when none existed because they had no idea how much time was

actually incurred.[29]

---

[29]My description of the efforts undertaken long after the fact by Mr. Leinbach's staff to
create some record of time spent in a matter when no such record exists is similar to all of my
other conclusions and my analysis of information that I have received about his efforts to create
time entries for his fee applications.  That is, I did not and do not now use for this case my
assumptions about his system and directions to his staff in other cases, other than to note that, in
case after case, it simply did not and does not work.  None of these assumptions, however, was
used to determine whether the charges in the Second Application in this case were legitimate or
otherwise.  My experiences with Mr. Leinbach's fee applications in these other cases does,
however, support my imposition of sanctions against him, as discussed in more detail below.

F.  Review of Applications, Reduction of Fees, and Sanctions Imposed for Mr.
Leinbach's Overcharge of His Clients in Spring 2007

I will highlight and briefly describe some more recent cases in which I
reduced Mr. Leinbach's fees to eliminate an overcharge and sanctioned him with a further
reduction of his requested fees.[30]

1.  In re Wise, No. 02-20931, slip op. (Bankr. E.D. Pa. Apr. 3, 2007)[31]

As described in the Wise decision, Mr. Leinbach had charged the estate for
attending a hearing on behalf of his clients.  As much as a negative proposition can
possibly be proven, Court records and the transcripts from that day clearly showed that
Mr. Leinbach did not attend any hearing before me that day and his 3.0 hour charge for
attending a hearing was a complete fabrication.  I reduced his requested compensation by
$720, which is the amount he charged for attending the alleged hearing.   After carefully
analyzing Mr. Leinbach's due process rights and after determining that appropriate

---

[30] The description of my prior decisions concerning Mr. Leinbach's fee applications in
other cases is not being used to determine whether the charges in the Second Application in this
case were legitimate or otherwise.  My experiences with Mr. Leinbach's fee applications in these
other cases does, however, support my imposition of sanctions against him, as discussed in more
detail below.  See also footnote 29, above.

[31] Mr. Leinbach appealed the Wise decision on March 19, 2007, and the case is now
before the United States District Court for the Eastern District of Pennsylvania (the "District
Court").  In re Wise, No. 07-1565 (E.D. Pa.).

17

grounds existed to sanction him, I also reduced his requested fee by an additional $720 as a sanction.

     2. <u>In re Heffner</u>, No. 05-26495, slip op. (Bankr. E.D. Pa. April 9, 2007)[32]

As described in the <u>Heffner</u> decision, Mr. Leinbach had overcharged the estate by overstating the time he attributed to Mr. Roth's attendance at a Section 341 creditors' meeting. The records show that, on the day in question, Mr. Roth had attended creditors' meetings on behalf of eighteen client/debtors, including the debtors in the <u>Heffner</u> case. Mr. Leinbach's fee application had failed to properly allocate Mr. Roth's time among his clients, charging the debtors in the <u>Heffner</u> case 2.0 hours. I reduced his requested compensation by $480, which is the amount he charged for attending the creditors' meeting. After carefully analyzing Mr. Leinbach's due process rights and after determining that appropriate grounds existed for a sanction, I also reduced his requested fee by an additional $520 as a sanction.

---

[32]Mr. Leinbach had appealed the <u>Heffner</u> decision on March 23, 2007, but he filed a motion to withdraw the appeal on June 4, 2007. For now, the case remains before the District Court. <u>In re Heffner</u>, No. 07-1564 (E.D. Pa.).

3. In re Bechtold, 06-20586, slip op. (Bankr. E.D. Pa. May 15, 2007)[33]

As described in the Bechtold decision, Mr. Leinbach had overcharged the
estate by overstating the time he attributed to Mr. Roth's attendance at a Section 341
creditors' meeting. Again, the records show that, on the day in question, Mr. Roth
attended the creditors' meetings on behalf of a second client/debtor in addition to the
debtors in the Bechtold case. Mr. Leinbach failed to properly allocate Mr. Roth's time
between his clients. I reduced his requested compensation by $300, which is the amount
he overcharged for the creditors' meeting.[34] After carefully analyzing Mr. Leinbach's
due process rights and after determining that appropriate grounds existed for a sanction, I
also reduced his requested fee by an additional $420 as a sanction.[35]

---

[33]The Bechtold decision is not on appeal.

[34]My order in Bechtold preceded the order in Heffner. I limited my reduction of the
requested fee in Bechtold to the overcharge portion of the fee. In the later Heffner decision, I
reduced the fee by the entire amount charged for attending the meeting. The fee in Wise, of
course, was reduced for the entire amount charged for the hearing because Mr. Leinbach did not
attend any hearing.

[35]See also In re Gray, No. 03-25573, order (Bankr. E.D. Pa. Mar. 27, 2007) (reduction of
compensation in the amount of $105 because Mr. Leinbach had improperly used his 2006 rate of
$240/hour for time incurred in 2004 - Gray was the first case in which I reduced Mr. Leinbach's
fee for using an improper rate - no sanction was imposed); In re Arno, No. 05-27228, order
(Bankr. E.D. Pa. Apr. 27, 2007) (reduction of compensation because Mr. Leinbach used his 2007
attorneys' and paralegals' rates for 2006 time).

19

## IV.  MR. LEINBACH'S SECOND FEE APPLICATION IN THIS CASE

Although the Bechtold opinion was entered in May 2007 and the Wise and

Heffner opinions were entered in early April 2007, they all relate back to orders reducing

Mr. Leinbach's fees in February or March 2007, at least a month before the Praecipe and

Revised Certification were filed in this case.  I point to this timing as support for my

determination that my rulings in these cases were well known to Mr. Leinbach at the time

he pressed the Second Application in this case.  At the time that Mr. Leinbach filed the

Praecipe and before the Second Application in this case was heard, I had ruled on most of

the overcharges discussed above (and more) by Mr. Leinbach in the cases cited above and

in his other fee applications.  Mr. Leinbach is therefore charged with full awareness of all

of the preceding opinions and orders that relate to his fee applications generally and this

Second Application in particular.

A.  Reduction of Mr. Leinbach's Fees for Overcharging for an Attorney Attending a
Hearing on Behalf of Debtor When the Attorney Was Also Attending Other Hearings for
Other Clients at the Same Time

Upon my review of Mr. Leinbach's Second Application, I noted that he had

charged more time than appeared to be appropriate for the attendance of Mr. Roth at a

hearing on behalf of Debtors, on Thursday, August 24, 2006.  Mr. Leinbach once again

had failed to allocate properly the total time spent at the hearing among the clients for whom Mr. Roth had appeared on that date.

Mr. Leinbach had included in the Second Application, a time entry of 2.0 hours for Mr. Roth, on August 24, 2006, that reads: "Preparation appearance and travel time to and from Motion to Dismiss/Confirmation hearing." On August 24, 2006, Mr. Roth had appeared for Debtors in one of the cases on the Chapter 13 Trustee's 9:00 list. The Court records show that Mr. Roth appeared for clients in at least three other Chapter 13 Trustee cases on the 9:00 list that day:   In re Corcoran, No. 05-25315; In re Clauss, No. 05-28954; and In re Oliva, No. 05-28999.  Four other of Mr. Leinbach's cases were on the original 9:00 Chapter 13 list that day, but they appear to have been resolved prior to that day and Mr. Roth did not appear for them.  The four Chapter 13 Trustee 9:00 cases in which Mr. Roth appeared were entirely resolved before 10:00 a.m.  The record also reflects, however, that Mr. Roth appeared for two other clients that morning in two hearings that were on my 9:30 general list.  He appeared in In re Asken, No. 05-20092, a valuation hearing, and he appeared in In re Stempo, No. 05-24437, a claim objection hearing.  Mr. Roth's appearances in these two hearings ran from 9:56 a.m., until 12:26 p.m., roughly two and one-half hours.

Mr. Leinbach attributed and charged, in the Second Application, 2.0 hours of Mr. Roth's time that morning for the hearing on behalf of Debtors, which amount of time I reject.  I also reject the reduced time of 1.75 hours that he charged for the August 24,

2006 hearing, through the later-filed Praecipe and Revised Certification.[36]

In an abundance of caution, Mr. Roth could have left his Lehigh Valley office at 7:30 (or at 7:00 at the earliest) to attend the hearings on the Chapter 13 Trustee's 9:00 list.[37] The round trip travel time would be three and one half to four hours (perhaps more, probably less), which would be divided among all six clients' cases that day. This results in approximately 0.7 hours (rounding up) per client for travel time. To that figure, I add 0.25 hours of time for each of the four clients with hearings on the 9:00 list (they started at 9:00 a.m. and finished before 10:00 a.m.) plus 0.1 hour per client for preparation of memos to file,[38] which results in a total of about 1.0 hour.[39] Mr. Leinbach

---

[36]At the April 26, 2007 hearing on the Second Application, I noted to Mr. Leinbach that the Revised Certification and Praecipe had changed the billing rate from the incorrect 2007 rate to the correct 2006 rate. See my discussion of Mr. Leinbach's attempted manipulation of his rates below. I also asked him if any of the time entries had been changed and he told me twice that none had been changed. As I noted in footnote 7 of my May 21, 2007 Order, Mr. Leinbach later admitted that he had decreased the time for attending the August 24, 2006 hearing. I discovered, upon my further review, however, that he had also added a new time entry for a new task, which partially offset the reduction in the time billed for the hearing.

[37]Cases on a 9:00 list are never fully resolved until at or about the time of the 9:30 list. Although I frown on late arrivals, if counsel were very occasionally to arrive late to the 9:00 list for some reason, his case would be heard without detriment to his client.

[38]Mr. Leinbach's time entry for Mr. Roth does not include anything about preparing a memo to file about the hearings that day, but Mr. Leinbach now combines that task with attending the hearing, which I acknowledge.

[39]The calculation actually yields 1.05 hours, but the memos for the two clients who had full hearings from 10:00 a.m. to 12:00 p.m., were substantially longer and necessarily more detailed and time-consuming than the very brief memos for the Chapter 13 list clients. See Supplemental Statement, Exhibit "B," document No. 87 on the docket in this case. Also, I used the maximum travel time of 4.0 hours in the calculation. I therefore rounded down the de minimis amount of 0.05. The actual amount of time attributed to Debtor's hearing could be (perhaps should be) 0.9 or less.

now seeks to charge Debtors for 1.75 hours of time for their hearing, rather than the

actual time of 1.0 hour.  The overcharge resulted in a fee inflated by the amount of

$180.[40]

Quite simply, Mr. Leinbach has failed to prove to me that the time claimed

for the August 24, 2006 hearing was actually incurred and earned.  Mr. Leinbach carries

the burden of establishing that the requested fees were actually earned.  See Younger v.

Pennsylvania Resources Corp. (In re Younger), 360 B.R. 89, 97 (Bankr. W.D. Pa. 2006),

citing Zolfo Cooper & Co. v. Sunbeam-Oster Co., Inc., 50 F.3d 253, 261 (3d Cir. 1995).

He has failed to satisfy that burden.

I refer now to the similar circumstances in a fee application faced by the

Bankruptcy Court for the Northern District of Indiana.  In re Walker, No. 89-11748, 1991

WL 186585 (Bankr. N.D. Ind. May 21, 1991).  In Walker, the court substantially reduced

a fee requested by counsel who had charged time for hearings that he had not attended

and had overcharged for hearings he did attend on days in which he appeared for multiple

clients.  Walker, 1991 WL 185585, at *6-9.  The Walker court's review of that very

---

[40] The overcharge itself is a relatively small amount; this is not some Chapter 11 mega-case fee application.  But I see a systemic abuse and overreaching in Mr. Leinbach's repeatedly overcharging his fees.  This abuse may pertain to all of his cases causing me to spend extraordinary time carefully reviewing each and every fee application's time entries, notations of a retainer, requested expenses, and rate charges.  And, although $180 may not be much in many bankruptcy cases, it could be critical in the success or failure of a client's efforts to present and administer a successful Chapter 13 Plan.  Finally, an improper fee increase of $200 for possibly dozens and dozens of Mr. Leinbach's cases, easily amounts to several thousand dollars.

similar issue is informative and instructive for me,[41] and much of the nature of my review

and investigations of court records was quite similar to that of the Walker court.


B. Reduction in Fees for Mr. Leinbach's Charging 2007 Rates for 2006 Time


In my initial review of the Second Application, I discovered an additional

overcharge: Mr. Leinbach had applied his 2007 billing rate for time entered in 2006. Mr.

Leinbach's standard, ordinary rate for time charged for 2006 time was $240/hour. The

2006 rate was a 33% increase over the prior year's $180 rate, which Mr. Leinbach had

justified by saying he had charged the $180 rate for quite some time. He also increased

his standard, ordinary rate charged for 2007 time, however, to $280/hour, which

constitutes a 17% rate increase in one year's time. I do not presently question Mr.

Leinbach's 2007 rate because it is not at issue in this case. Mr. Leinbach is an

experienced, senior attorney, for whom the rate of $280/hour might be appropriate (this

issue has not yet come before me). Most consumer debtors' attorneys who practice

before me charge less, but a few (not many) other consumer debtors' attorneys charge at

that rate or slightly higher. Mr. Leinbach has tried in other cases, however, to charge his

increased rates for time incurred in prior years, which I have not knowingly permitted.

See, e.g., In re Gray, No. 03-25573, order (Bankr. E.D. Pa. Mar. 27, 2007) (reducing Mr.

---

[41]The Walker court's procedural approach to protecting counsel's due process rights may
run contra to the Busy Beaver decision, but it is otherwise instructive.

Leinbach's fee because he used his 2006 rate of $240/hour for time incurred in 2004,

when his rate was $180/hour).

In this case, after I issued the Show Cause Order, Mr. Leinbach filed the

Praecipe with the Revised Certification, charging his 2006 time with his 2006 rate.   The

change was made only after I pointed out the overcharge.  Mr. Leinbach would have used

the higher rate successfully if I had not closely examined his Second Application.  His

continued effort to illegitimately increase his fee (if he is not caught) demands much of

my time in carefully reviewing his fee applications.


C.  Overcharge by Seeking Duplicate Compensation for Many Legal Tasks that Had Been
Paid Through the "No Look" First Application and the Order Approving It


The next problem with the Second Application that I will review was not

addressed in the May 21, 2007 Order.[42]  When I approved the First Application and

approved payment of compensation to Mr. Leinbach, it was based upon only a general,

lumped together description of what tasks counsel had performed.[43]  In a fee application

---

[42]As I note below, I should have dealt with certain of the Second Application's other
incorrect charges in my May 21, 2007 Order, but I failed to do so.  I am now without jurisdiction
to change my May 21, 2007 Order because it is on appeal.

[43]See the description of services rendered in the First Application, document 18 on the
docket of this case.

seeking less than $2,000 (a "no look" application),[44] bulk billing such as this is permitted. The bulk, block description of services rendered that Mr. Leinbach submitted as part of his First Application, which I approved, included everything that would be necessary to get a client-debtor to and through confirmation, without necessarily including work on other adversarial or contested matters that might arise.[45] Mr. Leinbach, however, included numerous time entries in the Second Application for tasks that were (or should have been) included and paid through the First Application. These tasks include: Telephone calls, meetings, and letters with Chapter 13 Trustee and Debtors about confirmation of Debtors' plan and dismissal of Debtors' case; reviews of claims, file, payment history, and notes relating to confirmation and dismissal; preparation of amended schedules and Chapter 13 plans; and attendance at the confirmation/dismissal hearing. The time charged in the Second Application for tasks such as these, which were included in and compensated through the First Application, was 3.75 hours of paralegal time ($375) and 1.75 hours of attorney time ($420).

I should have caught and eliminated these time entries upon my initial consideration of the Second Application, but I failed to notice this duplicate charging

_____

[44]See footnote 15, above.

[45]It is entirely possible that many difficulties could arise in the course of getting a Chapter 13 bankruptcy through to a successful confirmation, which difficulties might lead to a fee higher than the initially contemplated "no look" fee application. In any such instance, however, counsel would not submit or rely upon a "no look" fee application, but would provide itemized, detailed time records to support the proposed fee.

until my closer review of both the First Application and the Second Application in

preparing this Opinion.  At this time, of course, I lack jurisdiction to revise the May 21,

2007 Order or to make any further rulings relating to the Second Application because that

Order and the Second Application are subject to the pending appeal.  Nevertheless, I feel

obliged to point out in this Opinion another facet of the Second Application that I have

found is incorrect and overreaching.  I next review my authority to review the Second

Application sua sponte, with no objection from any other party.


## V.  THE COURT' POWER AND DUTY TO REVIEW SUA SPONTE COUNSELS'
## FEE APPLICATIONS


The 1994 decision of the Third Circuit Court of Appeals in In re Busy

Beaver Building Centers, Inc., 19 F.3d 833 (3d Cir. 1994), described my powers and

responsibilities as a Bankruptcy Judge in reviewing counsels' fee applications.  Every

Bankruptcy Court in the Third Circuit has relied upon, and most courts have described,

the Third Circuit Court's prescription of a court's powers and requirements for reviewing

fee applications.  I will not reiterate the background or any of the Busy Beaver approach

to secretarial/paralegal time, because they are not at issue in this matter.  Busy Beaver is

important here for two reasons:  First, it establishes not only my power, but my duty, to

review sua sponte, counsels' fee applications; and second, it sets forth certain precepts

that courts shall follow to protect counsels' due process rights in the review of fee

applications when no other party has objected.  Again, both of these issues have been

addressed and analyzed by numerous prior courts, so I will only summarize <u>Busy</u>

<u>Beaver's</u> guidance for me.


A.  Power and Duty of Bankruptcy Court To Review Fee Applications Sua Sponte


Sections 105[46] and 330[47] of the United States Bankruptcy Code and Federal

Rule of Bankruptcy Procedure 2016[48] provide broad support for both my power and my

duty to review counsels' fee applications sua sponte without regard to whether an

objection has been advanced by some other party.  <u>Busy Beaver</u>, 19 F.3d at 841-45.

---

[46]Section 105(a) of the Bankruptcy Code is clear and compelling authority for my power
to review, sua sponte, a fee or expense application.  <u>Busy Beaver</u>, 19 F.3d at 841.  Section 105(a)
provides in part:

> No provision of this title providing for the raising of an issue by a party in interest
> shall be construed to preclude the court from, sua sponte, taking any action or making
> any determination necessary or appropriate to enforce or implement orders or rules, or
> to prevent an abuse of process.

11 U.S.C. § 105(a).

[47]Section 330 states that "the court may, on its own motion or on the motion of [others]
award compensation that is less than the amount of compensation that is requested."  11 U.S.C. §
330(a)(2).

[48]Rule 2017(b) expressly spells out my power to review fee applications of a debtor's
counsel on my own initiative.  <u>Busy Beaver</u>, 19 F.3d at 841.  Rule 2017(b) provides:

> On motion of [others] or on the court's own initiative, the court after notice and a
> hearing may determine whether any payment of money or transfer of property, or any
> agreement therefor, by the debtor to an attorney after entry of an order for relief in a
> case under the Code is excessive . . . .

Fed. R. Bankr. P., Rule 2017(b).

Going beyond saying that Bankruptcy Courts have the power to review fee applications

sua sponte, the Third Circuit found "a <u>duty</u> to review fee applications, notwithstanding

the absence of objections" by other parties. <u>Busy Beaver</u>, 19 F.3d at 841 (emphasis in

original).


## B.  Due Process Protections Upon a Court's Review of a Fee Application


The Third Circuit did not leave the review of fee applications in a

procedural vacuum, but explained in some detail the protections, including a right to a

hearing, that must be accorded to counsel whose fee application has been rejected or

reduced. <u>Busy Beaver</u>, 19 F.3d at 845-48. <u>Busy Beaver</u> reviewed differing approaches to

ensuring that counsel have their due process rights protected.  First, a court may note

(presumably through some order) its specific concerns and allow counsel to supplement

the fee application in response thereto before holding a hearing and issuing an order on

the application. <u>Busy Beaver</u>, 19 F.3d at 846.  Second, a court could rely on the general

standards for reconsideration of an order. <u>Busy Beaver</u>, 19 F.3d at 846, quoting <u>In re</u>

<u>Pettibone Corp.</u>, 74 B.R. 293, 300-01 (Bankr. N.D. Ill. 1987).

The Third Circuit noted the mandate on courts to allow the fee applicant the

opportunity, if a request is made to the court, to present evidence or argument that the fee

application is sufficient.  The Circuit Court went on to explain that, to make the hearing

29

meaningful, the court should first apprise the fee applicant of the particular questions and objections it harbors. <u>Busy Beaver</u>, 19 F.3d at 846. The Court's statements on providing due process were all made in the context of dealing with a good faith fee applicant, one who reasonably attempts to comply with the statutory dictates and the federal and local rules.

I find that Mr. Leinbach overcharged for Mr. Roth's attendance at the August 24, 2006 hearing when he had also attended hearings on behalf of multiple other clients on that same day and advanced a fee application with the same types of errors contained in many previously rejected fee applications.[49] Such conduct constitutes bad faith. I believe, nonetheless, that Mr. Leinbach was and is entitled to the due process protections as explained by the Third Circuit Court in <u>Busy Beaver</u>.

## C. Eastern District of Pennsylvania Protection of Due Process in Fee Applications

The Third Circuit Court required, as one procedural mechanism, that a court give notice of specific issues with the fee application first and then hold a hearing. This is the procedural mechanism that I used by issuing the Show Cause Order. Alternatively, the Third Circuit required a court that denies some amount of the fee

---

[49]The two fee applications in this case also include, as examined above, misstatements that induce extreme unease when I consider whether the Second Application is appropriate in any aspect and whether it should be denied in toto.

without a hearing to notify the applicant of its particular reasons for denying the fees and,

if counsel desires to do so, to allow counsel the occasion to file a motion to reconsider to

defend the fee application with argument or evidence at a hearing. The United States

Bankruptcy Court for the Eastern District of Pennsylvania has provided precisely this

latter mechanism (in the context of a request for reconsideration) in its Local Rule 2016-

1(f), which states:

> (f) *Disposition Without Hearing: Reduced Award.* If the court without
> holding a hearing, awards an applicant less than the requested amount of
> compensation and reimbursement of expenses, an applicant's motion under
> Rule 9023 of the F.R.B.P. to alter or amend the order may include a request
> for a hearing on the application or be accompanied by a brief in support of
> the application. Such a motion to alter or amend is governed by LBR 9014-
> 2, Motions Determined Without a Hearing, except that the court shall hold a
> hearing if an applicant requests a hearing.

L.B.R. 2016-1(f) (2005). The Source for this local rule explains further:

> Subdivision (f). If the court rules on a fee application without holding a
> hearing, an applicant may file a motion under F.R.B.P. 9023 to alter or
> amend the order. This subdivision provides that if a Rule 9023 motion
> contains a request for a hearing, the court must hold a hearing before ruling
> on the Rule 9023 motion. If the Rule 9023 motion does not contain a
> request for a hearing, the court may dispose of the motion under L.B.R.
> 9014-2 without a hearing.

Full due process protection is therefore afforded to a fee applicant whose

fee is reduced despite no advance notice. Mr. Leinbach's due process rights in this case,

as described in and required by Busy Beaver, are amply satisfied and protected by the

Show Cause Order. Even with that prior notice, however, Mr. Leinbach had the

unqualified right under L.B.R. 2016-1(f) to request a hearing for reconsideration of the

May 21, 2007 Order. I would, of course, have afforded him such a hearing if he had
requested it.

## VI. ADDITIONAL REDUCTIONS IN ATTORNEYS' FEE AS A SANCTION

For any other attorney, the minimal overcharge for the hearing might be
forgiven. Certainly, it would not have resulted in a sanction. But with Mr. Leinbach's
history through Fall 2006, through early 2007, through the series of extensive opinions
and orders in March and April 2007, it is most difficult to look on the Second Application
as anything other than an intentional effort to increase his compensation.

Yet I have no smoking gun that unambiguously supports my suspicions
about Mr. Leinbach's approach to applying for compensation. So I do not severely
sanction him through any disciplinary or other order. Although it may appear to me that
Mr. Leinbach has repeatedly and intentionally sought to enhance his compensation
improperly, I will continue to give him the benefit of a constantly diminishing doubt and
merely reduce his fees and impose a sanction when appropriate. Perhaps the
overcharging is, once again, merely a reckless error, but his propensity for submitting
incorrect fee applications grows wearisome.

My May 21, 2007 Order did not merely reduce Mr. Leinbach's requested
compensation by the $180 amount of the overcharge for the hearing that Mr. Roth

attended on behalf of Debtors. As a sanction, I also deducted an additional $725 from my approval of and award of his fees.

Beginning in the Fall of 2006, through the Faust and Wasilewski hearings (which resulted in fee reductions for overcharging time), and through more recent cases, I have reduced Mr. Leinbach's fees. He has charged excessive amounts (1) for hearings or meetings that could not have taken as much time as he said, (2) for a hearing that did not take place, and (3) by applying a 2006 rate to 2005 time entries.[50]   Mr Leinbach's fee applications have continued to contain overcharges such as the overstated time in this case for attending the hearing and failing to allocate his time accurately. His repeated errors in this type of overcharge are symptomatic of his attitude in filing fee applications. The Second Application was filed in January 2007, but Mr. Leinbach revised it on April 24, 2007, through his Praecipe and the Revised Certification. The Praecipe was filed well after the hearings and instances of reduced fees in Fall 2006, in early 2007, and in the more recent full opinions reviewed above. In the many orders, decisions, and opinions prior to the filing date of the Second Application and the Praecipe, I have constantly reminded Mr. Leinbach that he holds a specific duty to examine his fee applications very carefully to avoid just the types of overcharging that occurred in this Second Application. He has clearly and consistently abrogated that duty. I will discuss below the basis of and support for the sanction that I will impose on him.

_____

[50]See, e.g., Wise, Heffner, Bechtold, and Gray.

A. The Court's Inherent Power To Sanction Attorneys

The Third Circuit Court of Appeals recognized the inherent power and authority of bankruptcy courts to sanction attorneys who act in bad faith when appearing before them in a prior case involving Mr. Leinbach, Leinbach v. Fein (In re Amoroso), 123 Fed. Appx. 43, 47 (3d Cir. 2004). I may not, and I would not want to, assess sanctions pursuant to my inherent power to sanction an attorney unless that attorney acted in bad faith. Leinbach v. Fein, 123 Fed. Appx. at 47. Mr. Leinbach is responsible for allowing an absurd number of faulty and incorrect fee applications (all of which result in higher than proper fees for him) to be prepared by his staff and to continue through the approval system. In the face of his certain knowledge that his time-keeping methodology is grossly deficient and faulty, Mr. Leinbach's persistence in advancing and pressing his reckless and erroneous fee applications constitutes bad faith.

In March 2007, Mr. Leinbach withdrew from my consideration a number of his pending fee applications.[51] Although he provided no express reason in his withdrawals of those fee applications, I had hoped that he understood that he should withdraw and re-review every pending fee application that relies on his error-prone

---

[51]See, e.g., In re Colon, 01-22199; In re Asken, 05-20092; and In re Honey, 05-23597.

34

methodology for the re-creation of time entries.[52]   It now appears that Mr. Leinbach has

withdrawn many (but not all)[53] of his pending fee applications.


## B.  Particularized Notice of Sanctions and Opportunity To Respond


The sanction in this case is being imposed with sufficient particularized

notice.  As explained in Leinbach v. Fein, 123 Fed. Appx. at 49, I must provide

particularized notice and some opportunity to respond to afford Mr. Leinbach due

process.

First, as in Leinbach v. Fein, Mr. Leinbach was clearly alerted, beginning in

Fall 2006, about the issues and offense for which he is now being sanctioned, i.e.,

overcharging clients and faulty time-keeping for his fee applications, yet he continues to

file excessive fee applications.  Mr. Leinbach simply must be aware that my questioning

and finding errors in one after another of his fee applications created in him an enhanced

duty to review all fee applications more carefully to avoid continual overcharging.

Because that awareness did not seem to arise naturally in him, I also expressly told him in

my prior decisions that he has that duty.  In this case, he has breached his duty.

Second, Mr. Leinbach's due process rights were and are fully protected.

---

[52]I had clearly stated as much in past decisions.  See Bechtold, Heffner, and Wise.

[53]See In re Webber, No. 06-21698; In re Maurer, 05-26997; In re Dick, 05-23971; In re
Davis, 03-20319; and In re Ebner, 03-22858, all of which are fee issues that remain open.

35

Mr. Leinbach had full notice of my inquiry into the Second Application in this case and

appeared at the hearing on it.   I allowed him a full and complete opportunity for a hearing

to present further evidence or argument and he did so, including filing additional

information after the hearing date.  His due process rights were and are fully protected by

the particularized prior notice of the error of his ways.

The $725 sanction in my May 21, 2007 Order was justified and supported

by the law and the record in this case.

## VII.  CONCLUSION

Mr. Leinbach has a long history of imposing on the Court, his clients, and

their bankrupt estates, fee applications that overcharge in numerous ways, including

charging for work that was not actually performed and charging for hearings or meetings

without properly allocating the time to other clients.  His past protests that his fee

applications are as good as possible fall far short of the mark because he has remained

unconcerned about properly monitoring the accuracy of his fee applications.  Mr.

Leinbach's overcharge for Mr. Roth's attendance at the August 24, 2006 hearing

mandated some escalation in the imposition of sanctions against him.

The sanction imposed on Mr. Leinbach by the reduction of his fees as

ordered in the May 21, 2007 Order is justified and appropriate.  He has apparently not

been dissuaded from overcharging his clients by my prior, minimal sanctions.  The

amount that I sanction him must increase in proportion to the overcharge and the $725

sanction was imposed for that reason.

This Opinion supplements and supports my May 21, 2007 Order and no

further order is necessary.

**Date: June 15, 2007**

_____

RICHARD E. FEHLING
United States Bankruptcy Judge